**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| PEIXUAN WANG, HEZHANG CHEN, DONGLIN GU, JIALIN HAN, WEN SHEN, YI GAO, YONGLIANG HUANG, JING WU, TIANJUN LI, and ROYAL PALM TOWN CENTER IV, LLLP, a Florida Limited Liability Limited Partnership, <br><br> Plaintiffs, <br><br> v. <br><br> REVERE CAPITAL MANAGEMENT, LLC, a Connecticut Limited Liability Company; REVERE CAPITAL, LLC, a Connecticut Limited Liability Company; and REVERE CAPITAL MANAGEMENT, LP, a Texas Limited Partnership, <br><br> Defendants. | **JURY TRIAL DEMANDED** <br><br> Case No. _____ |

## COMPLAINT

Plaintiffs PEIXUAN WANG, HEZHANG CHEN, DONGLIN GU, JIALIN HAN, WEN SHEN, YI GAO, YONGLIANG HUANG, JING WU, TIANJUN LI (the "Investor Plaintiffs" or the "EB-5 Victims"), and ROYAL PALM TOWN CENTER IV, LLLP (the "Partnership Plaintiff") (the "Partnership Plaintiff") (collectively, the Investor Plaintiffs and the Partnership Plaintiff will be referred to as the "Plaintiffs"), hereby file this Complaint seeking damages, sue Defendants Revere Capital Management, LLC; Revere Capital, LLC; and Revere Capital Management, LP (collectively, "Defendants" or "Revere Entities"), and allege:

1

## **INTRODUCTION**

### **EB-5 Program and the Plaintiffs' Investment**

1.      Investor Plaintiffs are the victims of a $26 million fraud, theft, and conspiracy in which a group of individuals, primarily based in Palm Beach County, Florida, developed a criminal enterprise (the "Royal Palm Fraud") to induce dozens of foreign investors into investing in United States real estate to obtain immigrant visas through the EB-5 program.

2.      This action concerns the unlawful use and fraudulent transfers of the Plaintiffs' funds from escrow accounts to Defendants' accounts by the masterminds of the Royal Palm Fraud (the "Royal Palm Group" or "RPG").

3.      The RPG conspirators fraudulently induced Investor Plaintiffs to invest $500,000, plus an additional $40,000 to $60,000 in administrative and legal fees, in exchange for a limited interest in Royal Palm Town Center IV, LLLP ("the Partnership").

4.      The RPG conspirators represented to the Investors Plaintiffs that the Partnership would then loan the funds to a job-creating entity, Royal Palm Development I, LLC ("RPD"), which in conjunction with funds of other EB-5 investors, would fund the purchase, construction, renovation, and leasing of sixty commercial condominium units within the Royal Palm Town Center Plaza (the "Project"). See *Exhibit "1"* for the terms and conditions of the loan provided by the Partnership to RPD and *Exhibit "2"* for the Comprehensive Business Plan for EB-5 Investment.

5.      Plaintiffs were promised that the foregoing business model would create the requisite number of direct and indirect jobs for Plaintiffs to meet the conditions of the EB-5 program. Plaintiffs were told that their funds would be held in escrow until the earlier of the

approval of the investors' I-526 immigration petitions[1] (the "I-526s") by the United States Citizenship and Immigration Services ("USCIS") or receipt of 100% of the offering.

6.      During the period from March 2011 to November 2012, Investor Plaintiffs funded $26.5 million into the Partnership, which was then transferred to RPD as a loan (the "RPD Loan") to purchase the property.

7.      However, this project was nothing more than a façade, and the Plaintiffs' funds were not held in the escrow account. Instead, contrary to all of the written and oral representations made by RPG, the Plaintiffs' funds were immediately stolen from the escrow account, distributed among the conspirators, and pillaged for the personal pleasure of the conspirators.

8.      Non-party Joseph J. Walsh ("Walsh") is the principal and founder of United States Regional Economic Development Center ("USREDA"), later known as the South Atlantic Regional Center ("SARC"), a regional center approved by the United States Citizenship and Immigration Services ("USCIS"). Through USREDA and SARC, Walsh purported to run investment programs, including the Project, as vehicles for foreign nationals to become U.S. legal permanent residents through the federal EB-5 program.

9.      In fact, Walsh used the Project and the Partnership as vehicles to commit a massive fraud upon the Plaintiffs. Other projects in which Walsh was involved were also rife with fraud, including the Palm House Hotel, which led the SEC to enter a judgment against him and others for losses in the tens of millions of dollars. See *Securities and Exchange Commission v. Palm House Hotel, LLLP,* Docket No. 9:18-cv-81038 (S.D. Fla. Aug. 03, 2018).

---

[1] The initial I-526 petition allows residence on a 2-year conditional basis, and the subsequent I-829 petition is required for United States Citizenship and Immigration Services to award unconditional (permanent) lawful residence in the US.

10.     RPD purchased the properties, but Walsh failed to secure the loan with a mortgage in favor of the partnership as promised.  RPD subsequently transferred over $9,000,000 to Connect Insurance Group, Inc., the business that was to complete capital buildout and lease the property. The buildout was never completed, however, and the vacant units were never filled.

11.     Because the commercial units remained largely vacant and unimproved, Plaintiffs' I-829 petitions were denied for failure to establish job creation as required, yet their funds were never returned.

## Receipt of the Plaintiffs' Stolen Funds by Revere Entities

12.     On August 30, 2013, on behalf of RPD, Walsh took out a loan from Revere High Yield Fund, LP, an investment vehicle of Revere Capital Management, LLC (the "Revere Loan"). Copies of a term sheet and loan documents between RPD and the Defendants are incorporated herein and annexed hereto as ***Exhibit "3."***

13.     The first paragraph of the term sheet, dated August 23, 2013, indicates that "Revere Capital LLC, its successors and/or assigns" is the lender to RPD. The final page of the term sheet indicates that Revere Capital Management, LLC is the servicer of such loan, and is the party responsible for collecting, on behalf of Revere Capital, LLC, payments on such loan via wires to an account at First Republic Bank belonging to Revere Capital Management, LLC. Accordingly, all payments made on such loan to Revere High Yield Fund, LP constitute transfers to both Defendants.

14.     On October 1, 2015, Revere Capital Management, LLC, a Connecticut limited liability company was converted into Revere Capital Management, LP, a Texas limited partnership. See ***Exhibit "4"*** annexed hereto.

15.     Revere Capital Management, LP, the successor of the converted Connecticut entity with continuity of ownership, benefitted from the payments received by Revere Capital Management, LLC.

16.     Revere Capital Management, LP currently serves as the investment adviser to the following four funds: Revere High Yield Fund LP; Revere Credit Opportunities Fund III LP; Revere Tactical Opportunities Fund IV, LP; and Revere Credit Opportunities IDF.

17.     Revere Capital Management, LP is an SEC-registered investment adviser with over $195 million under management.  "Founded in 2006, Revere Capital is an institutional private credit manager with deep expertise in lower middle-market commercial real estate bridge lending and specialty finance," states its website at https://www.reverecapital.com. The company is wholly owned, directly or indirectly, by Clark B. Briner, who is primarily responsible for the management of the company. See *Exhibit "5"* annexed hereto for the Form ADV Part 2A[2] of Revere Capital Management, LP.

18.     Item 8 "Methods of Analysis, Investment Strategies and Risk of Loss" of the Form ADV Part 2A states in pertinent part:

> **Methods of Analysis.**
> Revere will draw on its principal's experience in financing, owning and operating commercial real estate. The principal of Revere has experience in debt origination, nonperforming note acquisition, asset management, real estate advising and consulting, workouts, joint ventures and due diligence.

See *Exhibit "5,"* at p. 10.

19.     The section further states:

---

[2] Form ADV is a required submission to the Securities and Exchange Commission by professional investment advisors.  It specifies the investment style, assets under management ("AUM"), and key officers of an advisory firm. Form ADV must be updated annually and made available as a public record for companies managing in excess of $25 million. The second section of Form ADV deals with the AUM, investment strategy, fee arrangements, and service offerings of the firm.

**Risk of Loss. Fraud.**
Under certain circumstances, payment to a Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

See *Exhibit "5,"* at p. 12.

20.    Item 13 "Review of Accounts" of the ADV Part 2A states:

The Firm will perform regular monitoring and due diligence of investments in Client portfolios once an investment is made. Additionally, the firm will monitor investments to ensure compliance with financial covenants and adherence to underwriting guidelines agreed to during initial due diligence. Depending on Clients' needs, Revere's asset managers, investment committee and valuation committee review the Client portfolios on at least a quarterly basis or such other frequency that the Firm deems necessary to determine the accuracy, completeness, suitability and satisfaction of the Client's stated objectives.

See *Exhibit "5,"* at p. 26.

21.    The Investor Plaintiffs were not a party to the RPD loan transaction.  This loan transaction had no valid business purpose or any purpose under the rules of the EB-5 investment program.

22.    Between March 4, 2014, and July 30, 2015, Revere High Yield Fund, LP received eighteen transfers for a total of $1,612,798.91 in funds stolen from the Plaintiffs (the "Revere Transfers").

23.    The Defendants, Walsh, and his company RPD, benefited from the Revere Transfers because the Revere Transfers paid down debt on the loan owed by RPD to Revere Capital, LLC.

24.    The Royal Palm Fraud was conceived and helmed by Walsh and his co-conspirators and related entities that have already been found liable for their wrongdoings in this Court and by the SEC.

25.     On March 8, 2021, this Court entered a final judgment against Walsh, ordering him to pay Royal Palm Town Center IV, the partnership in which Plaintiffs invested, damages in the amount of $26 million.  See ***Exhibit "6"*** annexed hereto.  Walsh has fled the United States and his whereabouts are unknown.

26.     On October 23, 2020, the United States Bankruptcy Court for the Southern District of Florida granted the motion for approval of the settlement agreement between the Revere Entities and 160 Royal Palm, LLC, another group of investors whose funds have been fraudulently transferred to the Revere Entities. The plaintiffs there sought to avoid and recover transfers to the Revere Entities totaling $3,349,150.10 pursuant to Sections 726.105 and 726.106, Florida Statutes. Under the settlement agreement, the Revere Entities agreed to pay a sum of $1,220,000. See ***Exhibit 7"*** annexed hereto.

27.     The bar order entered in connection with the court's approval of the settlement agreement provides in pertinent part that it "does not release, or enjoin, Royal Palm Town Center IV, LLLP (the "Partnership"), or any of the Partnership's partners, from pursuing any claims the Partnership has or may have against the Defendant Parties that do not arise from the Transfers (as defined in the Settlement Agreement)." See ***Exhibit "8"*** annexed hereto.

28.     Despite the Revere Transfers being of the same nature as the fraudulent transfers of the 160 Royal Palm investors' funds to the Revere Entities, Defendants previously rejected reasonable offers of settlement with Plaintiffs.

29.     Plaintiffs, the true victims, now come to this Court, with clean hands, seeking assistance in their pursuit of redress, justice, and enforcement of their rights against the entities that received the stolen funds, benefited from the stolen funds, and/or actively conspired with or aided and abetted those that did.

## PARTIES AND RELEVANT NON-PARTIES

### Plaintiffs

30.   Peixuan Wang is a citizen of the People's Republic of China and resides in California. Peixuan Wang is over 18 years of age and is otherwise *sui juris*.

31.   Hezhang Chen is a citizen of the People's Republic of China and resides in California. Hezhang Chen is over 18 years of age and is otherwise *sui juris*.

32.   Donglin Gu is a citizen of the People's Republic of China and resides in California. Donglin Gu is over 18 years of age and is otherwise *sui juris*.

33.   Jialin Han is a citizen of the People's Republic of China and resides in Massachusetts. Jialin Han is over 18 years of age and is otherwise *sui juris*.

34.   Wen Shen is a citizen of the People's Republic of China and resides in California. Wen Shen is over 18 years of age and is otherwise *sui juris*.

35.   Yi Gao is a citizen of the People's Republic of China and resides in Florida. Yi Gao resides in Florida and is over 18 years of age and is otherwise *sui juris*.

36.   Yongliang Huang is a citizen of the People's Republic of China and resides in California. Yongliang Huang is over 18 years of age and is otherwise *sui juris*.

37.   Jing Wu is a citizen of the People's Republic of China and resides in California. Jing Wu is over 18 years of age and is otherwise *sui juris*.

38.   Tianjun Li is a citizen of the People's Republic of China and resides in Washington. Tianjun Li is over 18 years of age and is otherwise *sui juris*.

39.   Royal Palm Town Center IV is a Florida limited liability limited partnership in which each Investor Plaintiff along with others invested $500,000, plus an additional $40,000 to $60,000 in administrative and legal fees, to obtain an EB-5 visa based on the representations made

by Royal Palm Group.  The Investor Plaintiffs in this matter now control this entity to aid in their efforts to recoup their stolen money.

**Defendants**

40.     Revere Capital, LLC is a Connecticut company doing business in Palm Beach County, Florida.

41.     Revere Capital Management, LLC appears to be a converted Connecticut company that did business in Palm Beach County, Florida.

42.     Revere Capital Management, LP is a Texas limited partnership established through conversion of Revere Capital Management, LLC.

43.     Upon information and belief, at all relevant times, Revere Capital Management, LLC acted as the loan servicer on behalf of Revere Capital, LLC.

44.     Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, Revere Capital, LLC; Revere Capital Management, LLC; Revere Capital Management, LP; and Revere High Yield Fund, LP are the parents, subsidiaries, sister companies, successors-in-interest, alter egos or affiliates of one another, and all of which are controlled, managed, owned or operated by Clark B. Briner in such a way that the individuality or separateness of Defendants, and each of them, have ceased.

**JURISDICTION AND VENUE**

45.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (a)(1), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

46.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in Palm Beach County, Florida.

47.     The choice of law provision of the Revere Loan at issue states that "the Note shall be governed and construed in accordance with the laws of the State of Florida without regard for conflicts of law principles." See ***Exhibit "3,"*** at p. 9.

48.     This Court has personal jurisdiction over Defendants because they participated in tortious acts directed towards Florida, did sufficient business in Florida, have sufficient minimum contacts with Florida, and/or otherwise intentionally availed themselves of the Florida consumer market through the promotion of their services. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

49.     Defendants did not contest the jurisdiction before the United States Bankruptcy Court, Southern District of Florida, and thus waived any arguments that they did not conduct business in the State of Florida. *See 160 Royal Palm, LLC,* Docket No. 9:18-bk-19441 (Bankr. S.D. Fla. Aug 02, 2018).

50.     Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed and are obligated to pay a reasonable fee for their services.

## FACTUAL ALLEGATIONS

51.     USCIS administers the federal EB-5 Program, which provides an opportunity for a foreign national to obtain legal permanent residency in the United States by investing $500,000 or

$1,000,000 in a commercial enterprise that creates at least ten qualified full-time U.S. positions based on that investment.[3]

52.     After approval of the I-526 petition, immigrant investors receive conditional permanent residence status for a period of two years. Before the filing of Form I-829, known as Petition by Entrepreneur to Remove Conditions on Permanent Resident Status, the Regional Center is required to invest the immigrant's capital contribution in a job-creating commercial enterprise that creates at least ten qualified full-time positions in the United States.

53.     After an immigrant investor demonstrates to USCIS that his or her capital contribution was invested into a job-creating entity that produced at least ten qualified full-time jobs for U.S. workers based on the investment, the investor (and his or her immediate family) is granted U.S. lawful permanent residency through the filing and approval of an I-829 petition.

54.     Regional Centers are organizations designated by USCIS to promote economic growth in a particular geographic region. When a foreign national invests in an EB-5 project through a regional center, the job-creation requirement can be satisfied through a showing of indirect jobs created, rather than only direct jobs created.

55.     By way of a securities sales contract, each Investor Plaintiff invested $500,000 into the Partnership in exchange for one limited partnership interest and paid an additional $40,000 to $60,000 in administrative and legal fees. The securities offering was made to a total of 52 potential investors for a total capital raise of over $26 million.

56.     The funds invested into the Partnership were to be loaned to RPD for the purchase of sixty-two commercial condominium units within the Royal Palm Business Plaza located at 9200

---

[3] The values represent the requirements under the EB-5 Program at the time Plaintiffs invested and do not reflect inapplicable changes under the reauthorization of the program in 2022.

Belvedere Rd, West Palm Beach, Florida 33411, and such loan was to be secured by a mortgage on that property.

57.     Plaintiffs' funds were supposed to be held in an escrow account until their I-526 immigration petitions ("I-526s") were approved by USCIS. However, it has been proven in this Court that these funds were not held in escrow until such time.

58.     The Plaintiffs' funds were never destined to be invested towards the completion and operation of a viable and compliant EB-5 project. Instead, Plaintiffs' funds were stolen and transferred from the fake escrow account - which was just a regular business checking account - to other accounts, and ultimately pillaged.

59.     Over the course of the investigation into the brazen theft of their investments, Plaintiffs enlisted the assistance of forensic consulting and insolvency experts to track down the stolen funds. A comprehensive analysis of the methods used to traffic and launder these funds through various accounts and corporations was provided in the forensic report (the "Forensic Report") of KapilaMukamal, LLP (the "Expert"), which is annexed hereto as ***Exhibit "9."***

60.     The Partnership had an escrow account No. 7626 with PNC bank, titled "South Atlantic Regional Center, LLC Royal Palm Town Center IV, LLLP Escrow Account" (the "Escrow Account").

61.     Per the Partnership general ledger and Partnership Escrow Account bank records during the period from March 2011 to November 2012, the Investor Plaintiffs funded over $26 million to the Partnership. ***Exhibit "9,"*** at Exhibit A.  All such funds were the property of Plaintiffs once deposited into the Escrow Account.

62. The transfers totaling $26,500,122 were made from the Escrow Account to RPD. See *Exhibit "9,"* at Exhibit B. The first transfer was made on March 15, 2011, and the last transfer was made on August 14, 2013.

63. All funds transferred to RPD from the Escrow Account were to be used as a loan to purchase the property, which comprised sixty newly constructed commercial condominium unit shells. All funds transferred to RPD from the Escrow Account were to be transferred for the ultimate benefit of the Plaintiffs and no one else's benefit.

64. However, several millions of dollars of Plaintiffs' money were converted and transferred through various accounts without regard for their deployment in the Project, which Plaintiffs learned only in September 2020, when the Expert's investigation was concluded, and the Forensic Report released. See *Exhibit "9,"* at Exhibit D.3.

65. Although the funds received from the Escrow Account were commingled with other funds in the account, the Expert determined that certain transfers from the Escrow Account can be directly linked to payments in the same amount made on the same day to certain parties.

66. Between March 4, 2014, and July 30, 2015, eighteen transfers were made from the RPD escrow account at PNC bank ("Account #9946") to Revere High Yield Fund, LP for a total of $1,612,798.91. *Exhibit "9,"* Exhibit D at p. 2.

    1) On March 4, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;
    2) On April 2, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;
    3) On April 30, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;
    4) On May 27, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;
    5) On July 7, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;
    6) On July 30, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

7)   On August 27, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

8)   On September 29, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

9)   On October 27, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

10)  On November 25, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

11)  On December 29, 2014, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

12)  On February 2, 2015, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

13)  On February 2, 2015, a total of $30,000.00 was transferred from Account #9946 to Revere High Yield Fund, LP;

14)  On March 2, 2015, a total of $43,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

15)  On April 30, 2015, a total of $683,333.33 was transferred from Account #9946 to Revere High Yield Fund, LP;

16)  On June 1, 2015, a total of $112,736.12 was transferred from Account #9946 to Revere High Yield Fund, LP;

17)  On June 30, 2015, a total of $112,104.17 was transferred from Account #9946 to Revere High Yield Fund, LP;

18)  On July 30, 2015, a total of $111,292.00 was transferred from Account #9946 to Revere High Yield Fund, LP.

67.   The funds utilized to make all of the wrongful Revere Transfers were both legally and equitably the property of Plaintiffs that had originally been transferred from the Escrow Account to RPD.

68.   The Revere Transfers were made to the Defendants to pay off a loan obtained by RPD, an entity solely owned by Walsh and unrelated to the Plaintiffs and any EB-5 project in which they intended to invest.

69.   Plaintiffs were not a party to the RPD loan transaction with the Revere Parties.

70.   Plaintiffs received no economic benefit from the Revere Transfers or any other transfer of Plaintiffs' funds to the Defendants.

71.   All conditions precedent necessary to bring this action have occurred, have been satisfied, or have been waived.

## COUNT I – CLAIM AGAINST THE DEFENDANTS TO SET ASIDE FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT (Florida Statutes § 726.105(1)(a))

72.     Plaintiffs reallege and incorporate Paragraphs 1 through 71 above as if fully set forth herein.

73.     To the extent permitted by law, this cause of action is pleaded in the alternative both individually and derivatively.

74.     Section 726.105(1)(a), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation ... (a)   With actual intent to hinder, delay, or defraud any creditor of the debtor."

75.     Between March 4, 2014, and July 30, 2015, by means of eighteen transfers, a total of $1,612,798.91 of the Plaintiffs' funds was transferred to or for the benefit of the Defendants as more fully set forth above.

76.     The Defendants were the initial transferees and/or immediate or mediate transferees of the fraudulently transferred funds or were the entities for whose benefit the transfers were made.

77.     The transfers were made with the actual intent to hinder, delay, or defraud Plaintiffs.

78.     Because the Revere Transfers constitute actual fraudulent transfers under Section § 726.105(1)(a), Florida Statutes, the Court should avoid them pursuant to Section § 726.108(1)(a), Florida Statutes.

WHEREFORE, Plaintiffs demand entry of judgment in their favor avoiding the transfers to the Defendants as set forth in this Complaint, together with such other and further relief as the Court deems just and proper.

## COUNT II – CLAIM AGAINST THE DEFENDANTS TO SET ASIDE FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT (Florida Statutes § 726.105(1)(b))

79.     Plaintiffs reallege and incorporate Paragraphs 1 through 78 above as if fully set forth herein.

80.     To the extent permitted by law, this cause of action is pleaded in the alternative both individually and derivatively.

81.     Section 726.105(1)(b), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation ... (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

82.     Between March 4, 2014, and July 30, 2015, by means of eighteen transfers, a total of $1,612,798.91 of the Plaintiffs' funds was transferred to or for the benefit of the Defendants as more fully set forth above.

83.     The Defendants were the initial transferees and/or immediate or mediate transferees of the fraudulently transferred funds or were the entities for whose benefit the transfers were made.

84.     Plaintiffs received less than reasonably equivalent and/or no value in exchange for the transfers.

85.     At the time of the transfers, Plaintiffs (i) were engaged or were about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to

16

the business or transaction; or (ii) intended to incur, or believed or reasonably believed that it would incur, debts beyond its ability to pay as they become due.

86.     Because the Revere Transfers constitute actual fraudulent transfers under Section § 726.105(1)(b), Florida Statutes, the Court should avoid them pursuant to Section § 726.108(1)(a), Florida Statutes.

WHEREFORE, Plaintiffs demand entry of judgment in its favor avoiding the transfers to the Defendants as set forth in this Complaint, together with such other and further relief as the Court deems just and proper.

## COUNT III – CLAIM AGAINST THE DEFENDANTS TO SET ASIDE FRAUDULENT TRANSFERS UNDER THE FLORIDA UNIFORM FRAUDULENT TRANSFER ACT (Florida Statutes §726.106(1))

87.     Plaintiffs reallege and incorporate Paragraphs 1 through 86 above as if fully set forth herein.

88.     To the extent permitted by law, this cause of action is pleaded in the alternative both individually and derivatively.

89.     Section 726.106(1), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

90.     Between March 4, 2014, and July 30, 2015, by means of eighteen transfers, a total of $1,612,798.91 legally and/or equitably belonging to Plaintiffs was transferred to or for the benefit of the Defendants as more fully set forth above.

91.     The Defendants were the initial transferees and/or immediate or mediate transferees of the fraudulently transferred funds or were the entities for whose benefit the transfers were made.

92.     Plaintiffs received less than reasonably equivalent and/or no value in exchange for the transfers.

93.     At the time of the transfers, Partnership Plaintiff was insolvent or became insolvent as a result of such transfers, or alternatively, intended to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

94.     Because the Revere Transfers constitute actual fraudulent transfers under § 726.106(1), Florida Statutes, the Court should avoid them pursuant to § 726.108(1)(a), Florida Statutes.

WHEREFORE, Plaintiffs demand entry of judgment in their favor avoiding the transfers to the Defendants as set forth in this Complaint, together with such other and further relief as the Court deems just and proper.

## COUNT IV – CLAIM AGAINST THE DEFENDANTS FOR EQUITABLE REPLEVIN/EQUITABLE LIEN

95.     Plaintiffs reallege and incorporate Paragraphs 1 through 94 above as if fully set forth herein.

96.     To the extent permitted by law, this cause of action is pleaded in the alternative both individually and derivatively.

97.     As a matter of equity, Plaintiffs are entitled to replevy the funds misappropriated by RPD at the instruction of its controlling person Walsh.

98.     As a matter of equity, Plaintiffs are entitled to an equitable lien on all funds in the possession of Defendants directly received by them which are directly traceable to Plaintiffs' Investments intended for EB-5 purposes.

WHEREFORE, Plaintiffs hereby demand judgment against Defendants for the total amount of at least $1,612,798.91, plus interest and costs, together with such other and further relief as the Court deems just and proper.

### COUNT V – CLAIM AGAINST THE DEFENDANTS FOR MONEY HAD AND RECEIVED

99.     Plaintiffs reallege and incorporate Paragraphs 1 through 98 above as if fully set forth herein.

100.    To the extent permitted by law, this cause of action is pleaded in the alternative both individually and derivatively.

101.    Money received erroneously must be returned to its rightful owner where it is unjust for the recipient of the money to retain it.

102.    All funds received by Defendants directly traceable from the EB-5 investments of Plaintiffs have been and continue to be unjustly retained by Defendants.  Defendants, who are experienced entities in the investment management arena, have also received the benefit of interest and investment returns on the Plaintiffs' funds.

103.    Given the foregoing, all funds received by Defendants directly traceable to the EB-5 investments of Plaintiffs, along with interest and investment returns earned on such funds while in the possession, custody or control of Defendants must be returned to them under the cause of action of money had and received.

WHEREFORE, Plaintiffs hereby demand judgment against Defendants for the total amount of at least $1,612,798.91, plus interest and costs, together with such other and further relief as the Court deems just and proper.

### COUNT VI – CLAIM FOR EQUITABLE TOLLING

104.    Plaintiffs reallege and incorporate Paragraphs 1 through 103 above as if fully set forth herein.

105.    The true extent of the unlawful use and fraudulent transfers of the Plaintiffs' funds was not ascertained until an insolvency advisory firm conducted a forensic accounting investigation into RPD's finances.

106.    The facts giving rise to the causes of action did not come to light until September 9, 2020, when Kapila Mukamal, LLP concluded its investigation and released the Forensic Report. See *Exhibit "9"* annexed hereto.

107.    Any statute of limitations that may be applicable to any of the counts outlined in this Complaint has been equitably tolled by the wrongful and fraudulent actions committed against the Plaintiffs.

108.    Equity and the interest of justice dictate that Plaintiffs should be excused from the applicable limitation period.

109.    Plaintiffs are entitled to relief from the harsh results of the Defendants' wrongful actions. Such relief would not prejudice the Defendants in any manner.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request a judgment in their favor and against Defendants (a) in an amount no less than $1,612,798.91, (b) statutory interest under the applicable rates under Florida law, (c) punitive damages of no more than $4,838,396.73 as permitted under Florida law given the Defendants' intentional conduct, (d) attorney's fees and costs and (e) any other relief that this Court deems just and equitable.

Dated: June 14, 2022

Respectfully Submitted,

LAW OFFICES OF ROBERT V. CORNISH, JR., PC

*/s/ Tatiana Baranova*
**TATIANA BARANOVA**
Florida Bar No. 1030880
Email: tbaranova@rcornishlaw.com
1395 Brickell Avenue, Suite 800
Miami, FL 33131
Tel: (305) 735-3450/Fax: (571) 290-6052

**ROBERT V. CORNISH, JR.** (*PHV pending*)
Email: rcornish@rcornishlaw.com
680 South Cache Street, Suite 100
Jackson, WY 83001

**KRISTY L. STANISLAWCZYK** (*PHV pending*)
Email: kstanislawczyk@rcornishlaw.com
32 Mercer Street, 3rd Floor
New York, NY 10013

**CHRISTINE HANLEY** (*PHV pending*)
Email: chanley@rcornishlaw.com
680 South Cache Street, Suite 100
Jackson, WY 83001

*Attorneys for Plaintiffs*